**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNMARK COVENTRY HOLDINGS, LLC,** | : | **CIVIL ACTION** |
| ***Plaintiff,*** | : | |
| | : | |
| **v.** | : | **No. 25-cv-1918** |
| | : | |
| **KOHL'S DEPARTMENT STORES, INC.,** | : | |
| ***Defendant.*** | : | |

**MEMORANDUM**

**KENNEY, J.** **SEPTEMBER 9, 2026**

Before the Court is Defendant Kohl's Department Stores, Inc.'s *Daubert* Motion to Exclude the Expert Report and Rebuttal Report of Ron Santicola (the "Defendant's *Daubert* Motion") (ECF No. 59). Plaintiff Pennmark Coventry Holdings, LLC opposes the exclusion of its proffered expert witness. *See* ECF No. 62. In the alternative, Plaintiff requests that the Court tailor any relief "to the specific opinions the Court finds objectionable." *Id.* at 2. For the reasons set forth below, the Court will **GRANT** Defendant's *Daubert* Motion (ECF No. 59) in full. The Court will exclude Mr. Santicola's Expert Report and Rebuttal Report, and will also preclude Mr. Santicola from testifying at the upcoming non-jury trial.

## I. BACKGROUND

### A. Factual Background

The Court draws the following facts from the parties' Concise Statement of Stipulated Material Facts, which accompanied Defendant's Motion for Summary Judgment. *See* ECF No. 58-4. On March 12, 2004, Plaintiff's predecessor in title entered into a lease agreement (the "Lease") with Defendant for retail space located at the Coventry Mall / The Shoppes at Coventry in Pottstown, Pennsylvania. *See id.* ¶¶ 1, 4, 6; *see also* ECF No. 58-5. The Lease "was set to

expire on January 31, 2026." ECF No. 58-4 ¶ 6. In April 2016, Plaintiff acquired the Coventry Mall property and "assumed the landlord's rights and obligations under the Lease." *Id.* ¶ 5.

A few years later, Plaintiff began negotiating with Defendant to secure either an amendment to the Lease or Defendant's consent to Plaintiff's proposed redevelopment of the interior mall that Defendant's store was connected to (the "Enclosed Mall") into a self-storage facility. *See id.* ¶ 12. On December 2, 2021, Plaintiff sent a letter to Defendant, stating that Plaintiff "had decided, effective May 2, 2022, to permanently close the interior of the mall" and to use "the former interior mall for self-storage with delivery access only from the rear" of the store. *Id.* ¶ 13; *see also* ECF No. 58-8 at 2. On January 6, 2022, Defendant expressly told Plaintiff that it did not consent to Plaintiff's proposed redevelopment of the Enclosed Mall into a self-storage facility. *See* ECF No. 58-4 ¶¶ 14, 19; *see also* ECF No. 58-9 at 2. On February 16, 2022, Plaintiff sent Defendant another letter, "offer[ing] to pay a one-time $50,000 fee in consideration for [Defendant's] approval" of Plaintiff's proposed redevelopment. *See* ECF No. 58-4 ¶¶ 15–16; *see also* ECF No. 58-10 at 2–3. Despite engaging in multiple discussions regarding Plaintiff's proposed redevelopment, the parties did not ever sign an amendment to the Lease or otherwise modify it, nor did Defendant explicitly consent to the proposed self-storage facility. *See* ECF No. 58-4 ¶¶ 18–19. Nevertheless, Plaintiff proceeded with its plan and, after receiving zoning approval, Plaintiff "stopped leasing the enclosed interior mall to new tenants" and started to redevelop the space. *Id.* ¶¶ 20, 22–23.

On January 1, 2023, Plaintiff "permanently closed the former interior Enclosed Mall." *Id.* ¶ 24. After completing the redevelopment of the space, Plaintiff opened a CubeSmart self-storage facility towards the end of 2024, in addition to a Fit Life Fitness and Pickleball center. *See id.* ¶¶ 25, 27. On October 17, 2024, around the time that CubeSmart opened, Defendant sent Plaintiff a

Notice of Default. *See id.* ¶ 28; *see also* ECF No. 58-13 at 2–4. On November 4, 2024, Plaintiff sent a letter in response, stating that it did not believe it was in default of the Lease, so there was nothing to cure. *See* ECF No. 58-4 ¶ 29; *see also* ECF No. 58-14 at 2–4. A few months later, on March 31, 2025, Defendant permanently closed its store. *See* ECF No. 58-4 ¶ 31. Defendant also sent Plaintiff a notice on April 11, 2025, in which it stated that it was terminating the Lease and vacating the store. *See id.*; *see also* ECF No. 58-15 at 2–3.

**B. Procedural History**

After Defendant terminated the Lease, Plaintiff initiated this action on April 15, 2025, *see* ECF No. 1, seeking damages for unpaid monthly base rent, unpaid tax charges, and unpaid common area maintenance charges, among other damages. *See* ECF No. 10 ¶¶ 14–20, 25, 29–30, 34, 36; *see also* ECF No. 51-2 ¶¶ 3.1–3.8. On July 8, 2025, Defendant moved to dismiss Plaintiff's Second Amended Complaint. *See* ECF No. 14. On September 12, 2025, the Court granted in part and denied in part Defendant's Motion to Dismiss, permitting only Plaintiff's breach of contract claim—which was premised on a failure to timely pay rent—to proceed to discovery. *See* ECF Nos. 20, 21; *see also* ECF No. 10 ¶¶ 32–37. The Court also denied Defendant's subsequent Motion for Judgment on the Pleadings based on its Counterclaim for breach of contract. *See* ECF No. 39.

Thereafter, the parties engaged in several months of discovery. After the close of fact discovery and shortly before summary judgment motions were due to be filed, Defendant moved to strike Plaintiff's belated "mall doors" breach theory and associated damages theory based on diminution in value, "de-malling," and appraisal-based mall-wide valuation impacts, which had not been disclosed to Defendant until the day that fact discovery was set to close. *See* ECF No. 51-12 at 6. The Court granted Defendant's Motion to Strike and precluded Plaintiff from:

> (1) asserting, pursuing, or introducing evidence or argument regarding any breach-of-lease theory based on Defendant's alleged

> closure of, or failure to open, any interior doors to the shopping mall (the "mall doors" theory), including any contention that such alleged conduct excused, suspended, or otherwise discharged Plaintiff's performance obligations under the Lease; and (2) asserting, pursuing, or introducing evidence or argument regarding any damages theory based on diminution in value, "de-malling," appraisal-based mall-wide valuation impacts, or any similar valuation-based damages purportedly attributable to the "mall doors" theory, including without limitation any claim seeking damages in excess of $4 million based on such theory.

ECF No. 52 at 1; *see also* ECF Nos. 56–57.

On June 22, 2026, Defendant filed a Motion for Summary Judgment, which Plaintiff opposed. *See* ECF Nos. 58, 61, 63. In their summary judgment briefing, the parties primarily disputed whether Plaintiff breached the Lease and whether any breach was material, such that termination of the Lease was warranted. *See* ECF No. 58-3 at 16–28; ECF No. 61 at 9–28. Specifically, Defendant highlighted three provisions of the Lease that were purportedly breached: (1) the provision that prohibits the landlord from "substantially chang[ing], modif[ying,] or alter[ing] the Enclosed Mall[,]" *see* ECF No. 58-5 § 6.5(a)(iii); (2) the provision that requires the landlord to "maintain the Shopping Center in continuous operation . . . as a unified retail shopping center[,]" *see id.* § 7.1; and (3) the provision that precludes the landlord from "us[ing] or permit[ting] the use of any portion of such space for" the prohibited use of "[w]arehouse, storage or for any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation[,]" *see id.* §§ 7.2(a)(iv), Exhibit I (a); *see also* ECF No. 58-3 at 17.

On August 28, 2026, after a rigorous review of the record and the parties' briefing, the Court denied Defendant's Motion for Summary Judgment. *See* ECF No. 66. The Court explained that, even if it "were to conclude that there was a breach of the Lease, . . . the determination of whether that breach was material, such that further performance was excused," was a determination that was "best left to the trier of fact on a fully developed trial record." *Id.* at 2.

In addition to filing a Motion for Summary Judgment, on June 22, 2026, Defendant filed a *Daubert* Motion to Exclude the Expert Report and Rebuttal Report of Ron Santicola, Plaintiff's expert witness. *See* ECF No. 59. Plaintiff filed an Opposition to Defendant's *Daubert* Motion to Exclude the Expert Report and Rebuttal Report of Ron Santicola (the "Opposition") on July 13, 2026. *See* ECF No. 62. Defendant filed a Reply in Further Support of Its *Daubert* Motion to Exclude the Expert Report and Rebuttal Report of Ron Santicola on July 21, 2026. *See* ECF No. 64. Defendant's *Daubert* Motion is fully briefed and before the Court.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See* Fed. R. Evid. 702. Rule 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.* In addition, pursuant to Federal Rule of Evidence 104(a), a trial court is tasked with "decid[ing] any preliminary question about whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a). The proponent of the expert testimony must demonstrate by a preponderance of the evidence that the testimony is reliable and admissible. *See In re Paoli R.R. Yard PCB Litig.*,

35 F.3d 717, 744 (3d Cir. 1994); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (same).

Motions to exclude expert witness testimony are generally evaluated under the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. In *Daubert*, the Supreme Court held that Rule 702's standard for admitting expert testimony displaced the long relied upon "general acceptance" test delineated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *See* 509 U.S. at 585–89. In displacing the "general acceptance" test, the *Daubert* Court held that under Rule 702, the trial court—acting in its "gatekeeping role"—"must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 597. Put another way, the proposed expert testimony must "rest[] on a reliable foundation" and be "relevant to the task at hand." *Id.* at 597. To guide the trial court, the Supreme Court set forth several questions or factors to consider in connection with assessing whether an expert's testimony is reliable and "will assist the trier of fact." *Id.* at 593–94; *see also infra* at 17–18.

The Supreme Court later clarified that the *Daubert* factors are also relevant for testimony that is based on "technical" or "other specialized knowledge[,]" "not only to testimony based on scientific knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotations and citation omitted). In addition, the Supreme Court noted that the trial court "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. While the *Daubert* factors "will often be appropriate for use in determining the reliability of challenged expert testimony[,]" they "neither necessarily nor exclusively appl[y] to all experts or in every case[,]" and were intended to afford

the trial court "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 141, 152.

The Third Circuit has further distilled these principles and has instructed that, when determining the admissibility of expert testimony, the trial court is "tasked with a rigorous gatekeeping function . . . to ensure that 1) the expert is qualified; 2) the proposed testimony is reliable and concerns matters requiring scientific, technical, or specialized knowledge; and 3) the expert's testimony is sufficiently tied to the facts of the case . . . so that it fits the dispute and will assist the trier of fact." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (cleaned up); *see also UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (same). "Rule 702 applies whether the trier of fact is a judge or a jury." *Id.*

## III. <u>DISCUSSION</u>

Defendant moved to strike Mr. Santicola's Expert Report and Rebuttal Report, and to preclude him from testifying at trial. *See* ECF No. 59-3 at 6. In its *Daubert* Motion, Defendant raises several arguments in support of exclusion. First, Defendant contends that Mr. Santicola opines on issues that the Court has already barred, so his Reports "do not fit any issue remaining for trial." *Id.* at 11. Second, Defendant argues that Mr. Santicola's Reports do not satisfy the *Daubert* factors and are not the product of a reliable, "testable methodology." *Id.* at 12; *see also id.* at 13–16. Third, Defendant argues that Mr. Santicola offers inadmissible legal conclusions and "repeatedly crosses [the] line" into improper contractual interpretation. *Id.* at 17. Fourth, Defendant contends that Mr. Santicola's Rebuttal Report "repeats his central opinions" and "does not merely rebut" Defendant's experts. *Id.* Finally, Defendant takes issue with Mr. Santicola's qualifications, arguing that "the experience [Mr. Santicola] identifies is not the kind of specialized

expertise that qualifies him to render the specific causation and valuation-allocation opinions he advances." *Id.* at 18.

In its Opposition, Plaintiff argues against the "wholesale exclusion" of Mr. Santicola's Reports and his testimony. *See* ECF No. 62 at 2. First, Plaintiff contends that the Court did not preclude Mr. Santicola from testifying on relevant "topics for which he was retained more broadly[,]" such as Defendant's "role as an anchor tenant." *Id.* at 1. According to Plaintiff, only one of the distinct topics he was retained for "overlaps with the precluded independent-breach theory." *Id.* at 5. Second, Plaintiff argues that the traditional *Daubert* factors "do not mechanically apply" to Mr. Santicola's category of testimony because he is offering "experience-based, practical-knowledge testimony" based on "an operational and commercial perspective." *Id.* at 2, 6–7. Third, Plaintiff argues that, even if Mr. Santicola made "isolated statements that arguably stray toward contract interpretation" or that could be considered legal conclusions, the proper "remedy is targeted limitation of those specific statements[,]" rather than exclusion. *See id.* at 2; *see also id.* at 8. Fourth, Plaintiff contends that Mr. Santicola appropriately rebuts Defendant's experts in his Rebuttal Report and "responds directly to" their reports. *Id.* at 8–9. Finally, Plaintiff argues that the challenges that Defendant raises to Mr. Santicola's experience, background, and qualifications go to weight, rather than admissibility. *Id.* at 9–11. Plaintiff requests that the Court deny Defendant's *Daubert* Motion or, in the alternative, tailor any relief "to the specific opinions the Court finds objectionable." *Id.* at 2.

For the reasons that follow, the Court will grant Defendant's *Daubert* Motion in full, exclude Mr. Santicola's highly problematic Expert Report and Rebuttal Report, and preclude Mr. Santicola from testifying at trial. As discussed below in detail, Mr. Santicola is not qualified to opine on the topics that he provides testimony on. In addition, there are several other issues with

his Reports: many of his opinions (1) do not fit the case and are not helpful to the trier of fact; (2) are not the product of reliable principles and methods, and primarily consist of *ipse dixit*; (3) touch on the parties' state of mind or border on doing so; and (4) consist of inadmissible legal conclusions and contractual interpretation. Given the significant defects in Mr. Santicola's Reports, the Court is not persuaded that simply narrowing his Reports and testimony will suffice. Rather, this is a situation in which exclusion is warranted.

**A. Qualifications**

The Court starts by analyzing whether Mr. Santicola is qualified to provide expert testimony on the topics for which he has been proffered. As discussed above, Rule 702 requires that a witness be "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702; *see also De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) ("Experts must be qualified to offer opinions"). The Third Circuit applies "a generally liberal standard of qualifying experts." *Elcock v. Kmart Corp.*, 233 F.3d 734, 742 (3d Cir. 2000) (collecting cases). "[A]t a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal quotations and citation omitted). This specialized knowledge can come from "formal training[,]" credentials, or "practical experience." *Elcock*, 233 F.3d at 743. That said, there is still "a floor with respect to an expert witness's qualifications[,]" *id.* at 742, and courts in this District "have not pursued a policy of qualifying *any* proffered witness as an expert." *Waldorf*, 142 F.3d at 625. For example, the Third Circuit has previously found that a "district court abused its discretion in allowing" a tractor sales representative "to testify as an expert on the cause of [a] tractor shovel fire" where the proffered expert witness "was not an engineer[,]" "had no experience in designing construction machinery[,]" "had no knowledge or experience in determining the cause

of equipment fires[,]" "had no training as a mechanic[,]" and "had never operated construction machinery in the course of business." *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114–15 (3d Cir. 1987).

Applying these principles here, the Court has serious reservations as to whether Mr. Santicola has the requisite qualifications and knowledge to testify on the topics for which he has been proffered. In his Expert Report, Mr. Santicola states that Plaintiff retained him

> to provide [his] opinions from a commercial real estate, shopping-center and retail operations perspective concerning (a) [Defendant's] role as an anchor tenant at Coventry Mall; (b) the significance of interior mall connectivity between [Defendant] and the [E]nclosed [M]all/common area; (c) the commercial effect of [Defendant's] failure to reestablish meaningful interior mall participation after the COVID shutdown period; and (d) the resulting effect, if any, on [Plaintiff] and the value of the property.

ECF No. 59-5 ¶ 1; *see also* ECF No. 59-6 ¶ 1 (listing the same retention purposes in his Rebuttal Report). But even a cursory review of his CV reveals that he appears to have little, if any, experience with these identified topics. *See* ECF No. 59-5 at 30–35.

Plaintiff does not dispute that Mr. Santicola has no formal training in appraisals or valuation of commercial properties, let alone in interior shopping mall connectivity. *See* ECF No. 62 at 2, 9. Instead, Plaintiff states in general terms that Mr. Santicola is "offering . . . experience-based, practical-knowledge testimony." *Id.* at 2. Plaintiff further contends that "Mr. Santicola's qualifications reflect decades of senior executive experience in multi-location retail operations, including responsibility for tenant relationships, store-level performance, and the commercial dynamics between anchor tenants and the balance of a shopping center." *Id.* at 3. But Mr. Santicola's CV does not reflect the experience that Plaintiff contends that he has with respect to large-scale shopping centers. *See* ECF No. 59-5 at 30–35. As another court has also noticed regarding Mr. Santicola, *see Exist, Inc. v. Tokio Marine Am. Ins. Co.*, No. 22-cv-1679 (S.D.N.Y.),

ECF No. 49 at 19:25–21:9, [hereinafter *Exist, Inc.* Tr.], the primary industries that he appears to have business experience in are fuel/petroleum distribution and operation of convenience stores at fuel service stations. *See* ECF No. 59-5 at 30–35. And he appears to frequently serve as an expert witness in cases involving petroleum and energy companies or fuel service stations. *See id.* at 42–50. Indeed, Plaintiff concedes that "Mr. Santicola's career has centered on petroleum distribution, convenience-store operations, and multi-unit fuel retailing rather than enclosed shopping-mall management specifically." ECF No. 62 at 9; *see also id.* at 10 ("Kohl's may fairly argue to the jury that Mr. Santicola's experience lies predominantly in convenience and fuel retailing rather than enclosed shopping centers"). That career experience is a far cry from experience and knowledge of commercial retail shopping malls and valuation of commercial real estate. *See Exist, Inc. v. Tokio Marine Am. Ins. Co.*, No. 22-cv-1679, 2023 WL 7117369, at *1 (S.D.N.Y. Oct. 5, 2023) (explaining that Mr. Santicola's reports were precluded in part because "plaintiff made no showing that Santicola . . . has any 'specialized knowledge' concerning the inventory management issues relevant to this action, as required by Rule 702(a)").

In addition, Mr. Santicola's CV contains a lengthy list of his "Core Competencies[,]" which include "Tactical Market Planning[,]" "Fuel Distribution Channels[,]" "International Branding[,]" "Distribution chain expert[,]" "Organization Building[,]" "Public and Media Relations[,]" among others. ECF No. 59-5 at 30. Again, nothing on this list indicates that Mr. Santicola is competent to testify on the topics that Plaintiff claims he is qualified to provide opinions on, such as the value that an anchor tenant provides to a commercial shopping complex. Moreover, as Defendant points out, *see* ECF No. 59-3 at 18, Mr. Santicola's own CV reflects that his Florida real estate broker license is inactive. *See* ECF No. 59-5 at 35; *see also* ECF No. 62 at 10 (acknowledging that Mr. Santicola's license is "inactive"). Accordingly, while Mr. Santicola may have developed broad,

executive experience in operating convenience stores at fuel service stations, it is not apparent how that experience translates to any specialized knowledge regarding the role that anchor tenants play in commercial malls, interior mall connectivity, and valuation of shopping malls.

There is also a notable absence of qualifications and experience regarding several other topics that Mr. Santicola covers in his Expert and Rebuttal Reports. For instance, Mr. Santicola opines on Defendant's financial health, investor-focused documents, and filings with the Securities and Exchange Commission. *See* ECF No. 59-5 ¶¶ 9, 11–12, 27, 42, 61–62; ECF No. 59-6 ¶¶ 17, 40. He also provides testimony on stock pricing. ECF No. 59-5 ¶ 13. However, based on his CV, Mr. Santicola does not appear to have relevant experience in evaluating those types of documents or in providing opinions on the financial status of a public corporation. *See id.* at 30–35. He is thus not qualified to testify about the state of Defendant's finances, the stock market, or the purported market stress that Defendant was facing when it terminated the Lease. Mr. Santicola further opines on the impact that the COVID-19 pandemic had on "retail shopping customer traffic." ECF No. 59-5 ¶ 10; *see also id.* ¶¶ 11, 56; ECF No. 59-6 ¶¶ 10, 32, 62. Likewise, Mr. Santicola does not appear to have any pertinent experience or specialized knowledge that permits him to reliably draw conclusions as to how the pandemic impacted large-scale shopping malls. As yet another example, Mr. Santicola provides rebuttal testimony on industry and land use codes from the North American Industry Classification System ("NAICS") and from the Institute of Transportation Engineers ("ITE"). *See, e.g.*, *id.* ¶¶ 27(b), 43, 46, 49, 63. But there is no indication from his CV that he has any formal training, qualifications, or experience in applying or employing land use-related codes.

Plaintiff contends that issues with Mr. Santicola's experience and qualifications "go[] to weight, not admissibility." ECF No. 62 at 10. The Court disagrees because, as discussed above,

Rule 702 requires the Court to first determine that a witness is "qualified" to be an expert before he can appear at trial. *See* Fed. R. Evid. 702. In other words, Mr. Santicola's qualifications directly bear on whether he is admissible as an expert witness. *See In re Paulsboro Derailment Cases*, 746 F. App'x 94, 98 (3d Cir. 2018) (explaining that "the opinion of a *qualified* expert witness is admissible" when certain criteria are met (emphasis added)); *Senese v. Liberty Mut. Ins. Co.*, 661 F. App'x 771, 774 (3d Cir. 2016) (explaining that a requirement of admissibility is that "the witness must be qualified to testify as an expert by possessing specialized expertise"). Here, the Court is not convinced that Mr. Santicola has the requisite specialized knowledge and background that is needed as to the topics that he provides testimony on. Indeed, another court has previously come to the same conclusion regarding Mr. Santicola's background and qualifications. *See Exist, Inc.* Tr. at 21:05–09 ("I am not persuaded by anything in the expert report or anything which has been presented to me on the record of this case that Mr. Santicola has the appropriate specialized knowledge which is the first step to admissible for an expert witness.").

**B. Fit and Helpfulness to the Fact Finder**

Even if the Court were to assume that Mr. Santicola is qualified and has specialized knowledge, his Expert Report and Rebuttal Report are riddled with other significant problems, starting with "fit" and helpfulness to the fact finder.

Rule 702(a) requires that the proposed expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). Courts have also described this as "the 'fit' requirement." *Elcock*, 233 F.3d at 756 n.13. Expert testimony is admissible only if it "is sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985); *see also Daubert*, 509 U.S. at 593 (explaining that a trial court must determine whether the expert's

"reasoning or methodology properly can be applied to the facts in issue"). The Supreme Court provided the following example as a way to think about "fit" in *Daubert*: an expert on "[t]he study of the phases of the moon" might be able to "provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact." *Id.* at 591. But "evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night" in the absence of any "creditable grounds supporting such a link." *Id.* Accordingly, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

Here, the key valuation or "causation" opinions that Mr. Santicola provides are not helpful to and will not assist the fact finder in determining any disputed, factual issues. *See, e.g.*, ECF No. 59-5 ¶¶ 58–60, 63; *see also* ECF No. 59-6 ¶ 18.[1] The Court previously precluded Plaintiff from "asserting, pursuing, or introducing evidence or argument regarding any damages theory based on diminution in value, 'de-malling,' appraisal-based mall-wide valuation impacts, or any similar valuation-based damages purportedly attributable to the 'mall doors' theory, including without limitation any claim seeking damages in excess of $4 million based on such theory[,]" because Plaintiff failed to adequately place Defendant on notice that it would be pursuing such a theory prior to the completion of discovery. *See* ECF No. 52 at 1; *see also* ECF No. 56 at 3–5. Mr. Santicola's proposed testimony that Defendant caused "approximately 20%–25% of the decline in appraised c \ value, or roughly $2.53 million to $3.16 million[,]" by closing its interior mall doors during the COVID-19 pandemic (and keeping them closed for unspecified periods of time

[1] Furthermore, as discussed below, Mr. Santicola's valuation and causation opinions are also not the product of reliable principles and methods. *See infra* Part III(C).

thereafter) goes precisely to that barred damages theory and is otherwise not relevant to determining whether the parties breached certain provisions within the Lease. *See* ECF No. 59-5 ¶ 59. Accordingly, Mr. Santicola's opinions on this subject have no connection to the pertinent issues that will be addressed at trial and are thus not admissible expert witness testimony. *See Daubert*, 509 U.S. at 591–92.[2]

In addition, Mr. Santicola repeatedly provides what is best described as commentary on specific documents or evidence that does not require any specialized knowledge. For instance, citing to deposition testimony, Mr. Santicola states that "Kohl's Corporate representative, Mr. Stehly, could not give a reason the doors were not reopened when permitted to be." *See* ECF No. 59-5 ¶ 22. In the following paragraph, he writes that, "[o]n April 7, 2021, there was correspondence regarding 'De-Malling' the store in Coventry Mall, with two different cost estimates for performing that operation, including remodeling, between Kohl's personnel." *Id.* ¶ 23. Later in his Expert Report, he quotes from an email, noting that "Mr. Alex Birdsall, Kohl's Manager of Real Estate, states in the June 22 e-mail, 'We are in talks to get a document started

---

[2] The fact that Mr. Santicola's valuation and causation opinions will not assist the fact finder does not lead to the conclusion that every opinion in Mr. Santicola's Expert and Rebuttal Reports is *ergo* unhelpful, as Defendant appears to argue. *See* ECF No. 59-3 at 11. Defendant contends that "the Court has already struck any theory, testimony or argument based on Kohl's alleged closure of, or failure to open, the interior mall doors[.]" *Id.* Not so. The Court precluded Plaintiff from introducing any evidence or argument regarding Defendant's closure of its interior mall doors *to the extent that* Plaintiff was planning to introduce it as a basis to argue that Defendant breached the Lease or to proffer a damages theory based on diminution in value or appraisal-based impacts. *See* ECF No. 52. That does not mean that *all* testimony regarding Defendant's closure of its interior mall doors has been barred in its entirety if it pertains to other relevant, admissible issues.

Moreover, Plaintiff points out that Mr. Santicola's Expert and Rebuttal Reports cover distinct topics beyond the precluded mall-doors breach theory and valuation damages theory, such as Defendant's "role as an anchor tenant[] [and] the significance of interior mall connectivity to the shopping center as a commercial matter[.]" ECF No. 62 at 1. However, as discussed herein, the Court has identified several problems with those portions of Mr. Santicola's Expert and Rebuttal Reports as well.

that would allow for self-storage for our entrance closure and reflow store cover costs[.]'" *Id.* ¶ 33 (citation omitted).

These types of dressed-up descriptions of what documents supposedly say are scattered throughout his Reports, in addition to what appears to be a factual timeline of relevant documents narrated by Mr. Santicola. *See, e.g.*, *id.* ¶¶ 15, 18, 22–25, 30–44, 47–48, 50; ECF No. 59-6 ¶¶ 33, 35–37. Mr. Santicola's comments on what documents say or do not say are not helpful; the trier of fact can view the documents that are admitted into evidence at trial itself, listen to fact witnesses' testimony, and draw its own conclusions as to what that evidence says and means without the assistance of Mr. Santicola. *See Exist, Inc.* Tr. at 13:13–16 ("Okay, well, if that's true, then it's not really the subject of an expert opinion at all one way or the other. [Mr. Santicola is] just commenting on the evidence."); *see also Senese*, 661 F. App'x at 775 ("Expert testimony is not helpful when the untrained layman would be qualified to determine . . . the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute" (internal quotations and citation omitted)).

Accordingly, in addition to the lack of qualifications that Mr. Santicola has for the testimony that he provides, most of his testimony does not appear to fit the issues that remain in this case and will not be helpful to a fact finder at trial.

**C. Reliability**

The Court turns next to whether Mr. Santicola's testimony satisfies the reliability standards articulated in *Daubert* and its progeny. "Even a qualified expert may only testify 'so long as the process or technique the expert used in formulating [his] opinion is reliable.'" *De La Cruz*, 597 F.

App'x at 91 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742).[3] "*Daubert*'s reliability requirement ensures that an expert's testimony is 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" *Cohen*, 125 F.4th at 461–62 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80–81 (3d Cir. 2017)). "[A]dmissibility does not hinge on 'whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.'" *Id.* at 462 (quoting *Karlo*, 849 F.3d at 81). However, the expert's testimony must, at a minimum, be "supported by 'good grounds.'" *Id.* (quoting *UGI Sunbury LLC*, 949 F.3d at 834). And this requirement "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Id.* (internal quotations and citation omitted). "While there is no definitive checklist or test," the trial court's determination of whether the expert's testimony is supported by "good grounds" is guided by a consideration of the *Daubert* factors. *Id.* (internal quotations and citation omitted). These factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the

[3] While the Third Circuit has "stressed the importance of in limine hearings in making the reliability determination required under Rule 702[,]" particularly when "there is a scant record supporting an expert's proffered opinion," *De La Cruz*, 597 F. App'x at 92, the Court finds that a hearing is unnecessary here. The Court has the benefit of both Mr. Santicola's Expert Report and Rebuttal Report, in addition to his CV and a list of cases he has previously been retained for. *See* ECF Nos. 59-5, 59-6. Though all of the exhibits that Mr. Santicola referenced in forming his opinions do not appear to have been submitted to the Court, some are part of the summary judgment record or were hyperlinked in his Reports. Furthermore, the expert reports that Mr. Santicola rebutted were also filed on the docket. *See* ECF Nos. 58-16, 58-17. This evidentiary record is thorough, and the parties have fully briefed Defendant's *Daubert* Motion, so a hearing is unnecessary. *See De La Cruz*, 597 F. App'x at 92 ("[W]here the evidentiary record pertaining to an expert is extensive, a court does not abuse its discretion in ruling on a *Daubert* challenge without a separate hearing.").

> qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* (quoting *UGI Sunbury LLC*, 949 F.3d at 834); *see also United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (listing similar factors). "[N]o single factor is dispositive," but district courts are instructed to consult and provide "some analysis of these factors." *Cohen*, 125 F.4th at 462 (internal quotations and citation omitted).

Applying these reliability factors here, the Court concludes that Mr. Santicola's testimony is unsupported by "good grounds." *Id.* (internal quotations and citation omitted). Mr. Santicola describes the "methodology" that both his Expert and Rebuttal Reports are based on as follows:

> the methodology I used was that I reviewed the lease, internal documents from Kohl's and Pennmark, and my 40+ years of retailing experience relating to the synergy between interior mall retailers and anchor stores, retail operations, public records including Kohl's SEC required sales reports and forecasts, public stock investment commentary sites, local news reports, and governmentally provided information regarding the COVID restriction timelines.

ECF No. 59-5 ¶ 6; *see also* ECF No. 59-6 ¶¶ 6, 8. Boiled down, the "methodology" behind Mr. Santicola's opinions consisted of a review of documents provided by Plaintiff's counsel, combined with his years of retail experience. As discussed above, it is not at all apparent that Mr. Santicola has the qualifications or experience to opine on the topics that he provides testimony on. Moreover, with respect to the *Daubert* factors, the Court has serious concerns about the reliability of Mr. Santicola's amorphous "methodology" of document review and (mostly irrelevant) experience because it does not appear to contain testable hypotheses, to have been subjected to peer review, to have a known error rate, or to contain particular techniques that have been established to be reliable or testable. Nor has Mr. Santicola or Plaintiff demonstrated that this method is generally accepted in the appraisal, commercial valuation, or retail analytics fields.

Plaintiff contends that Mr. Santicola's methodology "is a recognized and unremarkable methodology for this category of opinion[,]" but provides no authority to support this bare assertion. ECF No. 62 at 7.

As to the opinions that Mr. Santicola provides pursuant to this "methodology," they are not supported by a reliable foundation. Instead, most of the opinions within his Reports are more properly characterized as *ipse dixit*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (explaining that trial courts retain discretion to exclude the testimony of expert witnesses where "there is simply too great an analytical gap between the data and the opinion proffered"). For example, Mr. Santicola repeatedly opines that Defendant's closure of its interior mall doors and "refusal to allow the mall traffic access to Kohl's . . . would have adversely affected the mall's interior retailers." ECF No. 59-5 ¶ 16; *see also id.* ¶ 46 ("The refusal of Kohl's to reopen the common area access doors was a contributing factor to the reduced commercial viability of the Common Area Stores."); *id.* ¶ 63 ("Keeping the anchor doors to the internal mall closed accelerated Pennmark's difficulties with being able to lease interior mall store locations"). But Mr. Santicola does not explain how he arrived at that conclusion and does not provide any underlying data in support of it: he offers no data on traffic patterns before or after the closure of the doors, provides no studies on how access to larger stores may impact smaller stores in an interior mall, and cites to no underlying documents in the record.

Similarly, Mr. Santicola opines that two other "national retailers" that were located near Defendant's store in the Enclosed Mall "should provide synergistic foot traffic for Kohl's[,]" and that "synergy between the smaller retailers and the anchor stores has been a long-time attractive feature for the internal mall retailers." *Id.* ¶¶ 17, 55; *see also id.* ¶¶ 18, 20, 49, 56–57, 63. However, Mr. Santicola likewise does not provide any data, principle, study, or methodology to bolster those

assertions. Simply put, it is not clear how he arrives at the conclusions in his Reports that Defendant's closure of its interior doors negatively impacted the Enclosed Mall; he merely states them as if they are unassailable based on his "40+ years of retail operations experience." ECF No. 59-6 ¶ 53. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146.

As another example, Mr. Santicola also "assess[es] the extent to which Kohl's conduct contributed to the decline in value in the period between the 2019 and 2022 appraisals," purporting to "use[] a causation-adjusted allocation approach." ECF No. 59-5 ¶ 58. As discussed above, Mr. Santicola has no apparent qualifications or experience in reviewing appraisals or conducting valuations of commercial shopping malls. *See supra* Part III(A); *see also* ECF No. 62 at 2 ("Mr. Santicola is not offering a formal appraisal"). In addition, Mr. Santicola does not explain what this "causation-adjusted allocation approach" is, what it consists of, why he decided to employ it, what the known error rate of the approach is, whether other experts in the field of appraisals use it, or whether it is a generally accepted methodology. Mr. Santicola goes on to note that he reviewed a 2019 Collier's appraisal, *see* ECF No. 51-9, "considered which of [the] risks" identified by Collier's "were materially worsened by Kohl's extended loss of meaningful interior mall participation, including reduced anchor utility, weakened interior tenant retention, the deterioration in tenant quality, and added leasing difficulty for the interior corridor spaces." ECF No. 59-5 ¶ 58. Mr. Santicola does not explain the basis for this method, why he chose those particular risks or inputs to "consider[,]" or whether others in the appraisal or valuation fields would similarly do so. *Id.*

Based on this review, Mr. Santicola then assigns an "allocation" of fault to Defendant for "exacerbating the already existing risks" that were facing the Enclosed Mall. *Id.* This "allocation" supposedly "reflects [his] *judgment*, based on the records supplied and [his] retail and shopping center experience, as to the incremental portion of the value decrease [he] attribute[s] to Kohl's." *Id.* (emphasis added). Once again, this is pure *ipse dixit* testimony that is unsupported by data or testable hypotheses, nor does there appear to be any rhyme or reason behind his assessment. In other words, the Court cannot determine how Mr. Santicola arrived at his "judgment" that Defendant is responsible for "20%-25% of the decline in appraised c \ value" because he never tells the Court in his Report. *Id.* ¶¶ 58–59; *see also* ECF No. 59-6 ¶ 18. Mr. Santicola appears to have plucked this number out of thin air. Mr. Santicola then goes on to note that he "do[es] not attribute the full $12,650,00 decline to Kohl's conduct." ECF No. 59-5 ¶ 59. But there is likewise no explanation as to why he does not do so, or as to the extent of the decline that may be attributable to alternative causes. Mr. Santicola then reiterates that his "allocation reflects [his] commercial real estate and retail operations judgment as to that portion of the decline attributable to Kohl's conduct aggravating already existing risks, rather than the portion attributable to general distress with the mall format, preexisting occupancy and tenant quality weakness, and other market forces." *Id.* ¶ 60. Once again, there does not appear to be any support, testable basis, or reliable principle for this conclusion, so it is difficult for the Court to even evaluate whether his causation approach is reliably applied to the facts of the case. The Court is instead left questioning how Mr. Santicola possibly decided that a particular amount was "attributable to Kohl's[,]" as opposed to "general distress" or "other market forces." *Id.*

The methodology that Mr. Santicola purports to rely on in his Rebuttal Report fares no better. He explains that the "methodology" he is using "to rebut the Arrow and Klein reports"

involves "comparing the findings in the reports against actual, documented fact, industry standard practice, and available empirical data." ECF No. 59-6 ¶ 7. And he insists that he is "referenc[ing] the specific analytic methods for [his] experience; retail operations assessment, anchor tenant behavior analysis, and shopping center viability." *Id.* ¶ 8. However, throughout his Rebuttal Report, there is almost no discussion of what the "industry standard practice" is that he is supposedly using to rebut Defendant's experts, or where he is deriving it from. *Id.* ¶ 7. Nor does he appear to rely on any "empirical data." *Id.* For example, he claims that "[t]here is actual data" that can "more accurate[ly] project[] . . . the traffic differentials the mall conversion would result in[,]" and speculates that "PennDOT and municipal records may contain localized and more precise data." *Id.* ¶ 45. But Mr. Santicola does not actually present that data, nor is it even clear to the Court that he would be qualified to do so. Instead, as with his Expert Report, his Rebuttal Report primarily falls back on his "experience," without any apparent reliance on generally accepted standards, principles, reports, or studies. *See, e.g.*, *id.* ¶ 39 ("In my experience, tenants do not wait that long to attempt to force a Default-level remedy, while actively negotiating to amend the lease."); *id.* ¶ 53 ("In my 40+ years of retail operations experience, national anchor tenants of Kohl's scale universally track customer traffic counts as a standard management tool.").[4]

Plaintiff brushes off the absence of data, documentation, or a testable methodology in Mr. Santicola's Expert Reports as fodder for cross-examination. *See* ECF No. 62 at 7 (arguing that "the absence of a quantitative model goes to the weight the factfinder should give the opinion, not

---

[4] Defendant also contends that Mr. Santicola's Rebuttal Report does not provide proper rebuttal testimony. *See* ECF No. 59-3 at 17–18. While Mr. Santicola at times repeats some of the conclusions that he made in his Expert Report, his testimony is sufficiently responsive to Defendant's experts' reports, so exclusion is not warranted on this particular basis.

whether the jury may hear it at all").[5] But Plaintiff ignores that the issues the Court has identified above go to the heart of whether Mr. Santicola is a qualified, reliable witness who will provide testimony based on reliable methods, foundations, and materials. Indeed, at least one other district court previously identified the same exact issue with Mr. Santicola's reports when deciding to exclude his testimony. *See Exist, Inc.* Tr. at 9:13–15 (noting that Mr. Santicola seemed to be providing "free floating opinions, unbounded or unsupported by any reference to materials on which an expert would normally rely"); *id.* at 11:13–19 ("Where does that [opinion] come from? Did [Mr. Santicola] pluck it out of thin air or is there some actual industry standard that says 3 percent is the outer limit for an acceptable variance in inventory counts? We don't know; he doesn't tell us. . . . this isn't about his subjective view of what's acceptable or unacceptable."); *id.* at 21:11–16 ("I find that many if not most of [Mr. Santicola's] key opinions as [sic] issued as *ipse dixits*, that is as pronouncements as to what is right or what is acceptable or what should be done in a particular situation with no identification, no discussion of the source of the standard which is being applied."); *id.* at 23:12–18 ("But the only source that the witness states for his opinion is, quote, 'having been in retail management for as long as I have,' again, that's a bit of an *ipse dixit*, the witness is, in effect, saying trust me, this was bad. We need more than that if an expert is going to testify as such in a United States district court.").[6]

---

[5] It is also ironic that Mr. Santicola criticizes Defendant's experts for purportedly failing to use site-specific data, *see* ECF No. 59-6 ¶¶ 31, 43–45, given the admitted and conspicuous absence of quantitative data in Mr. Santicola's own Reports.

[6] In connection with Mr. Santicola's "experience-based, practical knowledge testimony[,]" Plaintiff argues in its Opposition that "the classic *Daubert* factors . . . 'simply [are] not applicable'" to "that category of testimony" and "reliability instead 'depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" ECF No. 62 at 2 (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806–07 (3d Cir. 1997); and quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 148–49). The Court notes that it could not locate the language that Plaintiff purports to have quoted in either *Kannankeril* or *Kumho Tire Co., Ltd.* Therefore,

The Court emphasizes that it has only discussed a few examples of the *ipse dixit* nature of Mr. Santicola's testimony here. However, it is a recurring problem that is reflected throughout his Reports. *See, e.g.*, ECF No. 59-5 ¶¶ 10–11, 16–20, 28–29, 36, 46, 49, 55–63; ECF No. 59-6 ¶¶ 13, 15, 18, 25–26, 34, 38–39, 45, 47, 53, 55, 58, 62. While expert witnesses are given "testimonial

---

the Court questions whether this is merely an error by counsel, or whether Plaintiff may have relied upon a hallucinated quote from an artificial intelligence program.

Plaintiff also appears to have overstated what *Kannankeril* and *Kumho Tire Co., Ltd.* stand for at the page citations that it references. In *Kannankeril*, the Third Circuit did not state that the *Daubert* factors are inapplicable to experience-based testimony. 128 F.3d at 806–07. Rather, after discussing Rule 702's requirements, the Third Circuit explained that the *Daubert* factors are not intended to be "exhaustive" and may not be "applicable in every case." *Id.* However, "they provide a convenient starting point for analyzing" if "a particular scientific methodology is reliable." *Id.* The Third Circuit also noted that the reliability "inquiry focuses on principles and methodology[,]" and then proceeded to evaluate whether a doctor's testimony was sufficiently reliable, which included assessing the sources and methods that he had used in forming his opinions. *Id.* at 807; *see also id.* at 809 (noting that the medical expert had "based his opinion on . . . medical records, . . . general experience and readings, general medical knowledge, standard textbooks, and standard references").

Similarly, the *Kumho Tire Co., Ltd.* Court did not disclaim entirely the application of the *Daubert* factors to testimony that is based on "'technical' or 'other specialized' knowledge." 526 U.S. at 147. The Supreme Court expressly stated that Rule 702 "applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope." *Id.* The Supreme Court went on to hold that "*Daubert*'s general principles apply to the expert matters described in Rule 702." *Id.* at 149. In fact, the Supreme Court even noted that "some of *Daubert*'s questions can help to evaluate the reliability *even of experience-based testimony*." *Id.* at 151 (emphasis added). For example, "it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable." *Id.* Moreover, the *Kumho Tire Co., Ltd.* Court expressly "disagree[d] with the Eleventh Circuit's holding that a trial judge may ask questions of the sort *Daubert* mentioned only where an expert relies on the application of scientific principles, but not where an expert relies on skill- or experience-based observation." *Id.* (internal quotations and citation omitted). Instead, the Supreme Court did "not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts." *Id.*

Accordingly, both *Kannankeril* and *Kumho Tire Co., Ltd.* reiterate the importance of a trial court's gatekeeping function in determining the reliability of expert testimony, regardless of what it is based on. Moreover, they indicate that the *Daubert* factors may be useful in evaluating experience-based testimony.

latitude unavailable to other witnesses[,]" that latitude is premised "on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kumho Tire Co., Ltd.*, 526 U.S. at 148 (quoting *Daubert*, 509 U.S. at 592). Here, for the reasons discussed at length, Mr. Santicola's Reports do not appear to contain any reliable foundation in the knowledge and experience of experts in the appraisal, commercial valuation, or retail analytics disciplines; instead, his Reports primarily consist of his subjective beliefs and "judgment[s]" without any apparent way to validate or test those judgments. ECF No. 59-5 ¶¶ 58, 60; *see also Senese*, 661 F. App'x at 775 ("[E]xpert testimony may be based on experience so long as that experience provides appropriate validation for the proposed testimony.").

In sum, the Court concludes that Mr. Santicola's Reports are neither the product of reliable principles and methodologies, nor are they supported by "good grounds." *Cohen*, 125 F.4th at 462 (internal quotations and citation omitted). For this reason, too, Mr. Santicola's Expert and Rebuttal Reports will be excluded, and he will be precluded from testifying at trial.

**D. State of Mind**

Although the parties did not raise this particular issue in their briefing, Mr. Santicola's Expert Reports also appear to veer into inadmissible testimony on intent and state of mind. "It is well settled that [g]enerally, expert witnesses are not permitted to testify regarding intent, motive, or state of mind, or evidence by which such state of mind may be inferred." *Nat'l Med. Imaging, LLC v. U.S. Bank N.A.*, No. 16-cv-5044, 2019 WL 9829117, at *3 (E.D. Pa. Jan. 31, 2019) (internal quotations and citations omitted) (collecting cases); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

Mr. Santicola is not qualified to provide testimony on the parties' state of mind, nor is Plaintiff proffering him as an expert who is qualified to do so. *See* ECF No. 59-5 ¶ 1. Yet scattered throughout his Expert and Rebuttal Reports, Mr. Santicola appears to impermissibly opine on the state of mind, motivations, and purported intent of both parties. The Court provides some illustrative examples of the testimony that touches on Plaintiff's state of mind. *See, e.g.*, *id.* ¶ 26 ("To Pennmark, this would appear to be Kohl's getting ready to amend the lease."); *id.* ¶ 46 ("Pennmark had reason to believe Kohl's and Pennmark would reach accommodation."); *id.* ¶ 47 ("Pennmark had no reason to believe Kohls was going to claim a default and stop paying rent."); *id.* ¶ 51 ("Pennmark provided multiple items of evidence that *Pennmark felt* the 'De-malling' repurposing was normal course of business." (emphasis added)).

In addition, Mr. Santicola repeatedly provides testimony related to Defendant's supposed intent and motive behind terminating the Lease. For example, Mr. Santicola references "a series of emails in May 2020" between employees of Defendant and Plaintiff, but does not provide any citation to those emails. *Id.* ¶ 48. He then opines that the emails supposedly show that the parties were "just thinking ahead and responding to the lack of mall traffic post COVID lockdown." *Id.* These impermissible state of mind opinions permeate both his Expert and Rebuttal Reports. *See, e.g.*, *id.* ¶ 21 ("Kohl's decision seemed to be more financially driven, rather than driven by retail management."); *id.* ¶ 22 ("[I]t would seem [that Kohl's decision to close its internal doors] had little to do with the COVID lockdown and related to Kohl's own impression of the Pottstown location as being in a declining area and that it was a location that was economically weak."); *id.* ¶ 27 ("the rent requirement for Kohl's to pay a common area maintenance fee as part of the rent would also show that [Kohl's] had planned on being a true Anchor Store for the mall."); *id.* ¶ 41 ("This shows Kohl's awareness of the importance of anchor stores to a mall's viability."); *id.* ¶ 49

("The fact [that Defendant] refused to open the doors should show [Defendant] no longer had an interest as an anchor merchant for the mall's 'Common Areas,' and [was] looking for cost minimization at a store they felt was no longer viable."); ECF No. 59-6 ¶ 13 ("The Notice of Default was pretextual"); *id.* ¶ 26 ("[T]he well-documented fact that Kohl's refused to open the interconnected entrance to the mall . . . was used as a pretext to send the Notice of Default to Pennmark on October 17, 2024."); *id.* ¶ 29 ("It appears Kohl's premise for the Notice of [D]efault is not the absolute operating condition for Kohl's that they portray."); *id.* ¶ 34 ("Whatever reasons Kohl's had internally for reaching the decision to keep the doors between the mall and the store closed, it could not have been that a self-storage unit was planned for the mall interior."); *id.* ¶ 38 ("Their consent reflects the actual commercial understanding of parties operating under this lease.").

Mr. Santicola cannot opine on the parties' intent, motive, or state of mind, and any such testimony that does so, or borders too closely on doing so, is inadmissible. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Nos. 06-cv-1797, 06-cv-1833, 06-cv-2768, 2015 WL 12645766, at *5 (E.D. Pa. Dec. 22, 2015) (prohibiting experts from providing any "opinions regarding [d]efendants' knowledge, intent, or state of mind").

**E. Legal Conclusions**

The Third Circuit has also instructed district courts to "ensure that an expert does not testify as to the governing law of the case" because that type of testimony "would usurp the [d]istrict [c]ourt's pivotal role in explaining the law to the jury." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). While an expert is permitted under Federal Rule of Evidence 704 "to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion." *Id.* (internal quotations and citation

omitted); *see also Morgan-Mapp v. George W. Hill Corr. Facility*, No. 07-cv-2949, 2008 WL 11366456, at *1 n.2 (E.D. Pa. Oct. 3, 2008) ("[A]n expert may not state his or her opinion as to legal standards nor may he or she state any legal conclusions drawn by applying the law to the facts." (internal quotations and citation omitted)); *King Drug Co. of Florence, Inc.*, 2015 WL 12645766, at *6 (excluding "certain 'legal musings'" by proffered experts).

In his Expert and Rebuttal Reports, Mr. Santicola comes exceedingly close to providing legal opinions and straying into conclusions regarding how the parties' Lease should be interpreted. Indeed, at times his opinions read more like a closing argument crafted by counsel than an analysis by an expert witness. That testimony is inadmissible and must be excluded. *See Wolfe v. McNeil-PPC, Inc.*, 881 F. Supp. 2d 650, 661 (E.D. Pa. 2012) ("[E]xpert testimony that constitutes a legal opinion, is inadmissible."). For example, Mr. Santicola offers testimony that suggests he believes Plaintiff's self-storage facility should not be considered a prohibited use within the meaning of the Lease. *See* ECF No. 58-5 §§ 7.2(a)(iv), Exhibit I (a). In commenting on a February 16, 2022 letter from Plaintiff's CEO to Defendant's Portfolio Management Coordinator, Mr. Santicola opines that the CEO "shows that the self-storage facility is not considered to be a prohibited us[e]" based on how self-storage is categorized by the NAICS. *See* ECF No. 59-5 ¶ 31; *see also id.* ¶ 34 ("Pennmark then provided Kohl's with a legal opinion . . . that showed that the Self-storage facility does NOT violate the prohibited uses in the lease"); ECF No. 59-6 ¶ 27 ("The opinion Arrow reaches, over whether the CubeSmart self-storage facility was a 'prohibited use' that needed approval under the lease Kohl's was operating under, in my opinion, is not corroborated by the following facts"); *id.* ¶ 27(a) ("Pennmark provided Kohl's with a legal opinion . . . that showed that the Self-storage facility does NOT violate the prohibited uses in the lease"); *id.* ¶ 38 ("If self-storage were so obviously a prohibited use that no reasonable commercial

party would accept it, these two sophisticated tenants would not have consented."). Setting aside the issue of whether Mr. Santicola has the requisite experience and qualifications to opine on the NAICS and land-use codes (he does not appear to), whether Plaintiff's redevelopment of the Enclosed Mall into a CubeSmart constitutes a prohibited use within the meaning of the Lease is a legal question for the Court to decide; it is not appropriate for Mr. Santicola to offer his opinions on that topic.

In addition, Mr. Santicola opines in his Rebuttal Report that Defendant's expert's "discussion of how to classify the post-conversion Shoppes at Coventry under ICSC classification system *does not advance the analysis of whether the lease was breached*." *Id.* ¶ 24 (emphasis added). According to Mr. Santicola, "[t]he lease does not require the property to maintain any specific ICSC classification. The relevant questions are what specific operational obligations the lease imposed and whether these obligations were materially altered; questions that require analysis of the actual conduct of both parties, not industry classification labels." *Id.*; *see also id.* ¶ 37 ("Kohl's waited two years after the CubeSmart application was filed to serve the Notice of Default – conduct inconsistent with a party that genuinely regarded the change as an immediate and obvious material breach of its lease rights."); *id.* ¶ 20 (discussing Defendant's "active negotiation over a period of months to permit the very self-storage use it now characterizes as an obvious lease violation"). Again, it is not within Mr. Santicola's purview to denote what elements are necessary to demonstrate a breach, to determine whether those elements have been met, to decide what evidence bears on an analysis of breach, or to interpret what the Lease does or does not require. Moreover, Mr. Santicola is not proffered as an expert on commercial retail contracts, so his commentary on the provisions within the Lease is improper for that reason as well. *See* ECF No. 59-5 ¶ 43 ("The lease does not contain what is called a 'Go Dark' clause, where a provision is

made in the lease to leave the location before the term is completed, if the business dictates it."); *id.* ¶ 27 ("The lease originally does not anticipate the closing of Kohl's access to the common areas of the mall"); *id.* ¶ 28 (purporting to opine on "[t]he original intention of the [L]ease").

Plaintiff argues that even if "certain of these statements should be sharpened or excluded at trial," the Court should not preclude Mr. Santicola from testifying entirely and should instead issue "a narrow, targeted ruling directed at the specific sentences identified." ECF No. 62 at 8; *see also id.* at 2 (acknowledging that Defendant "identifies isolated statements that arguably stray toward contract interpretation"). However, given the plethora of other issues that the Court has discussed above with respect to Mr. Santicola's Expert and Rebuttal Reports, Plaintiff's proposed remedy is not workable here. The Court cannot simply fix the admissibility and reliability problems it has identified by excising paragraphs from his Reports or by ordering him not to provide any testimony on certain topics. At bottom, the Court is not persuaded that Mr. Santicola is qualified and can provide testimony that is based on reliable principles and methodologies consistent with Rule 702, so the Court will exclude both of Mr. Santicola's Reports and preclude him from testifying at trial.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant Defendant's *Daubert* Motion (ECF No. 59) in full. In addition, the Court will exclude Mr. Santicola's Expert Report and Rebuttal Report, and preclude Mr. Santicola from testifying at the upcoming non-jury trial. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**